IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ALEXA ANNETTE BLAISDELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 2796** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alexa Annette Blaisdell seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion, grants Defendant's motion, and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for SSI in February 2010, alleging that she became disabled on February 18, 1994 due to a learning disability, bipolar disorder, anxiety, obsessive compulsive disorder ("OCD"), and depression.[1] (R. 90, 96). The Social Security Administration denied the applications initially on September

---

[1] Plaintiff's mother also applied for child's insurance benefits on her behalf. (R. 16, 316-24).

16, 2010, and again upon reconsideration on March 15, 2011.  (R. 26-31, 43-51, 54-58).  Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge John L. Mondi (the "ALJ") on January 25, 2012.  (R. 338).  The ALJ heard testimony from Plaintiff, who was represented by counsel, Plaintiff's mother (Janine Tasson) and her stepfather (Lou Tasson), as well as from medical expert Kathleen O'Brien (the "ME").  Shortly thereafter, on February 23, 2012, the ALJ found that Plaintiff is not disabled because there are a significant number of jobs she can perform in the national economy.  (R. 16-25). The Appeals Council denied Plaintiff's request for review on February 22, 2013, (R. 6-8), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ: (1) erred in finding that she does not meet or medically equal Listing 12.05 for mental retardation; (2) made a flawed credibility determination; (3) made a flawed residual functional capacity ("RFC") assessment; and (4) improperly relied on the Medical-Vocational Guidelines (the "Grids") to find her capable of performing a substantial number of jobs.  As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and need not be reversed or remanded.

## **FACTUAL BACKGROUND**

Plaintiff was born on February 18, 1992, was 20 years old at the time of the ALJ's decision, and has lived at all times with her parents.  (R. 96, 273).  She started receiving special education services in 1st grade after her elementary

school assessed her with a mild mental impairment and an extremely low full scale IQ ("FSIQ") of 65 to 69. (R. 228). With the assistance of Individualized Education Programs ("IEPs") and special education classes, Plaintiff graduated from high school in 2010 at age 18. (R. 341). Her work history is best described as sporadic and limited. For example, in 2009 she was fired from part-time positions at Walgreens and The Village Squire Restaurant after only a few months because of poor attendance; she lost another part-time job at Nature's Fresh Market after one week because her cash drawer came up $300 short; and she was fired from L.A. Tan following a temporary leave of absence "due to having a friend behind the counter while working." (R. 83, 84, 269, 342-45). Most recently, she quit working at Jewel-Osco in 2011 because she could no longer lift boxes after she became pregnant with her daughter, who was born in or around July 2011. (R. 287, 290, 341, 346).

## A.    Medical History

On November 24, 2008, Plaintiff started seeing Conchita G. Gavino, M.D., of the Ecker Center for Mental Health due to anxiety and depression. (R. 244). Dr. Gavino's handwritten notes are largely illegible, but it appears that she saw Plaintiff on a fairly regular basis through October 26, 2009, and that she prescribed Prozac during the first visit, followed by Abilify in April 2009. (R. 238-44).

On November 26, 2008, Piper Stratton, M.A., Ed.S., completed a School Psychological Report of Plaintiff for Dundee-Crown High School. (R. 228-33). At the time, Plaintiff was a 16-year-old 11th grader with an FSIQ of 65. (R. 228-29).

Her academic skills fell between the Extremely Low and Low Average range, manifesting as a vocabulary at the 4th or 5th grade level and "particular weakness" with math calculations and reasoning, including making change for a dollar. (R. 230-31). Despite these global cognitive deficits, however, Ms. Stratton noted that Plaintiff exhibited strengths in the areas of "Working Memory" (short-term auditory memory) and understanding the relationships between real or concrete objects. (R. 230).

With respect to social-emotional functioning, Plaintiff exhibited moderate levels of anxiety and depression, reporting negative and anxious thoughts, stomach aches, heart pounding, shakiness, sleeping issues, and a fear of being hurt by others. She also said that she had recently seen a doctor for these symptoms and would soon be starting Prozac. (R. 231). An IEP prepared the same day indicated that Plaintiff had been able to maintain jobs "when she has the skills necessary for them," and could cook, clean, and do laundry. (R. 210).

Plaintiff's next IEP dated November 18, 2009 indicated that she could type very well in Vocational English and was "sweet" with "a great sense of humor." She exhibited "age-appropriate independent living skills" but continued to struggle with money and making change. (R. 193). A final IEP report from June 4, 2010 confirmed that Plaintiff had completed the course requirements for a high school diploma. (R. 185). Though she had difficulty with memory skills "especially when it comes to new concepts," she had obtained a driver's license and was "able to multi-task with assignments." (R. 172). She was also described as "a very competent young lady who appears to know what she wants

to achieve as a career after high school." (R. 185). In that regard, Plaintiff expressed interest in transitioning to the Nail Tech School to pursue cosmetology training. (*Id.*).

On June 21, 2010, David NieKamp, Psy.D., completed an Intellectual Assessment of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 269-72). Plaintiff told Dr. NieKamp that she had graduated from high school that spring, but suffers from headaches, stomach pain, panic attacks and a limited appetite. (R. 269). During the exam, she displayed no evidence of distractibility but she had difficulty recalling needed information. (R. 270). Dr. NieKamp assessed Plaintiff with an FSIQ of 67, which is within the range of Mild Mental Retardation and "significantly below that of her peers." (R. 271). He stated that Plaintiff "may benefit from having information presented with verbal/visual prompts and 'hands-on' instruction," and would likely "flourish in an environment (i.e. home, educational, and vocational) that provides a consistent structure/routine and clear/ample prompts." (*Id.*). Dr. NieKamp assessed Plaintiff with mild mental retardation and a variety of other "Reported" impairments including depression, anxiety, learning disability, OCD, bipolar disorder, headaches and stomach pain. (R. 271-72).

In a Mental Status Evaluation completed the same day, Dr. NieKamp noted that Plaintiff's memory seemed relatively intact and she displayed appropriate thought processes. (R. 275). Her cognitive functions "appear[ed] to be operating below developmental norms," however, suggesting that "her ability to advance in a professional setting is likely very limited" and she probably would

not "move beyond . . . entry level positions in the near future." (R. 275-76). Dr. NieKamp diagnosed moderate to severe anxiety, mild dependent features and problems maintaining consistent employment, and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 60.[2] (R. 276).

A few months later, on January 25, 2011, Barbara F. Sherman, Psy.D., conducted a Psychological Evaluation of Plaintiff for DDS. (R. 286-90). Plaintiff told Dr. Sherman that it is difficult for her to understand and follow directions, though she planned to attend a cosmetology school with a special program for individuals with learning disabilities. (R. 286, 287). She reported taking psychotropic medications in the past but also said that "[b]ecause she kept forgetting to do so, she canceled her appointments." (R. 287). At the same time, Plaintiff complained that she "felt that she had obsessive-compulsive disorder," which manifested as liking to have things tidy and in their place, liking to have her linens unwrinkled, and sometimes re-cleaning the house after she had already cleaned it. (R. 288).

Dr. Sherman diagnosed Plaintiff with cognitive disorder, NOS (not otherwise specified) and obsessive personality traits. She noted that Plaintiff was "independent for household chores, travel and personal hygiene," and was able to articulate her ideas well with adequate judgment and no pervasive

---

[2] The GAF score is "a psychiatric measure of a patient's overall level of functioning." *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011). A score between 51 and 60 reflects "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 807 n.1 (quoting American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-IV-TR) 34 (4th ed. 2000)).

symptoms of emotional distress. However, Plaintiff did exhibit some deficits in "attentional focus, basic fund of information, concept formation and arithmetic skills," and Dr. Sherman opined that Plaintiff cannot manage her own funds without assistance. (R. 290).

The last medical evaluation in the record is from March 10, 2011, when David Voss, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 291-93). Dr. Voss found Plaintiff to be moderately limited in the ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 291-92). Nevertheless, Plaintiff can: "understand and remember short instructions and complete simple one and two-step tasks"; "maintain attention, concentration and persistence necessary to carry out simple one and two-step tasks at a consistent pace over a regular 40 hr work week"; "make simple work-related decisions and independently sustain a work routine without the need for close supervision"; "adapt adequately to work situations and changes that occur in the usual workplace with reasonable support and structure"; "be aware of normal hazards, plan independently and set realistic goals"; and "use public transportation or travel independently in unfamiliar settings." (R. 293).

In a Psychiatric Review Technique completed the same day, Dr. Voss found that Plaintiff has moderate difficulties in maintaining concentration, persistence or pace, but only mild difficulties in maintaining social functioning and

carrying out activities of daily living, and no episodes of decompensation. (R. 305). According to Dr. Voss, Plaintiff does not meet any of the Listings, including 12.02 for Organic Mental Disorders and 12.08 for Personality Disorders, (R. 294), and her statements about problems completing tasks, concentrating and understanding appeared to be only "partially credible." Dr. Voss explained that during Dr. Sherman's examination, Plaintiff "with coaching was able to recite months of the year after she said that she could not," and she exhibited intact memory and adequate judgment. (R. 307).

B.     **Plaintiff's Testimony**

In a January 29, 2011 Function Report completed in connection with her application for disability benefits, Plaintiff stated that she has a hard time comprehending things, does not understand what she reads, cannot do math or count money, and finds it difficult to follow directions. (R. 129). On a typical day, she showers, changes clothes multiple times, "putz[es] around the house aimlessly," and sleeps a lot. (R. 130). She has no problems with personal care; regularly cleans, does laundry and mows the lawn; shops for food, clothes and personal items as needed; can go outside and drive by herself; and regularly hangs out with friends. (R. 130-33). At the same time, she has a hard time following directions to prepare anything more than simple meals; she cannot handle money; and she has problems with memory, completing tasks, concentrating, understanding and following instructions. (R. 131, 134).

At the January 25, 2012 hearing before the ALJ, Plaintiff testified that she has difficulty spelling and reading, and lost "every job I really had" because she

gets "stressed and really anxious."  (R. 342, 344).  She believes that she cannot work due to "issues with money," bad attendance, "bad anxiety," and depression, and also describes herself as compulsive with OCD "in some areas."  By way of explanation, Plaintiff noted that everything needs to be how she wants it, and she has kept a log of what her baby eats and when she's finished eating it.  (R. 345-46).  Plaintiff told the ALJ she had stopped seeing a psychiatrist a couple of years earlier because they wanted to put her on medication that made her sick and she was "afraid of that." (R. 346-47).  She acknowledged being able to drive to the store alone and socialize with friends, but said she cannot care for herself and her child financially.  (R. 348).

## C.     Testimony from Plaintiff's Mother and Stepfather

On August 10, 2010, Plaintiff's mother, Janine Tasson, completed a Function Report – Third Party in support of her daughter's disability application.  (R. 100-07).  Ms. Tasson stated that Plaintiff cannot remember procedures, count money, comprehend what she reads, or maintain schedules.  (R. 100).  She also wakes up afraid and complaining about physical ailments, and wants her mother nearby.  (R. 101).  Plaintiff can care for pets, clean, do laundry, shop, and communicate via phone, text or computer, but she has no ability to handle money.  (R. 102-04).  Ms. Tasson indicated that her daughter struggles with memory, completing tasks, concentration, understanding, and following instructions, and she can only pay attention for 5 to 10 minutes at a time.  (R. 105).  Though she gets along well with others, she does not handle stress well and suffers from loneliness, depression, anxiety and obsessive behaviors.  (R.

106).  Plaintiff refuses to take medication to help with these conditions due to side effects.  (R. 107).

Plaintiff's stepfather, Lou Tasson, completed a Function Report – Third Party on January 26, 2011.  (R. 120-28).  He stated that Plaintiff has "extreme difficulties with everyday tasks," a "very hard time focusing on the task at hand," and "very limited reading comprehension."  (R. 120).  Her math skills are "non existent" and she cannot remember procedures or maintain schedules.  (*Id.*).  Mr. Tasson indicated that Plaintiff is afraid to take her medication and needs reminders for "just about everything she needs to accomplish."  (R. 122).  She can follow oral instructions as long as they are short, but she cannot follow written instructions, is unable to handle stress, and is afraid of being alone because she thinks someone is going to enter the house.  (R. 125-26).

At the January 2012 hearing, Mr. Tasson testified that Plaintiff cannot hold a job because of severe anxiety.  She is "very afraid at all times" and finds it "very hard" to take direction.  (R. 352).  She cannot handle money at all and requires daily instruction even to remember to sweep the floor before mopping.  (R. 353).  Mrs. Tasson testified that Plaintiff's main problem is her low IQ.  She does not comprehend things and sometimes says she does when she does not.  (R. 356).  Plaintiff also goes through periods where she is "real high, running around like crazy," and then "all of a sudden" she "starts coming down" and gets "very low."  (R. 357).

**D.      Administrative Law Judge's Decision**

The ALJ found that Plaintiff's cognitive disorder, anxiety, depression, and obsessive-compulsive disorder are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 19-21).  After reviewing the medical and testimonial evidence, the ALJ determined that Plaintiff has the capacity to work at all exertional levels except that she is limited to performing unskilled work involving simple, routine tasks in a routine structure with no decision-making.  (R. 22).  The ALJ noted that this RFC is consistent with the ME's testimony, which he assigned significant weight, as well as the overall record.  (R. 24).  The ALJ acknowledged Dr. Voss's opinion that Plaintiff can make simple work-related decisions, but credited Plaintiff's testimony regarding anxiety in finding that she is "best suited to work in an environment that did not involve decision-making" as stated by the ME.  (*Id.*).  Given this RFC, the ALJ held that there are a significant number of jobs Plaintiff can perform such that she is not disabled within the meaning of the Social Security Act and not entitled to benefits.  (R. 24-25).

## DISCUSSION

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it

"displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. 42 U.S.C. § 1382c(a)(3); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 1382c(a)(3)(A). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because he: erred in finding that she does not meet or medically equal Listing 12.05 for mental retardation; (2) made a flawed credibility determination; (3) made a flawed RFC assessment; and (4) improperly relied on the Grids to find her capable of performing a substantial number of jobs.

**1.    Listing 12.05**

Plaintiff first argues that the ALJ should have found that she meets or equals Listing 12.05(C) or (D). Listing 12.05 relates to persons who have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . before age 22." *Fischer v. Barnhart*, 129 Fed. Appx. 297, 301 (7th Cir. 2005) (quoting 20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 12.05). The phrase "adaptive functioning" refers to a person's ability to perform activities of daily living and social functioning. *Id.* at 301-02. *See also Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir.

2007) (claimant must show that she is unable to "cope with the challenges of ordinary everyday life.").

If an individual makes this threshold showing, she must still demonstrate a certain "level of severity" for the disorder. *Id.* at 302. This can be done under 12.05(C) if a claimant has (1) an FSIQ of 60 through 70, and (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 12.05(C). The severity showing of 12.05(D) is satisfied if the claimant has an FSIQ of 60 through 70 and at least two of the following: (a) marked restriction of activities of daily living; (b) marked difficulties in maintaining social functioning; (c) marked difficulties in maintaining concentration, persistence or pace; or (d) repeated episodes of decompensation, each of extended duration. *Id.* § 12.05(D). At all times, the claimant "bears the burden of proving h[er] impairment meets a listing, and [she] must meet each of the requirements set forth in the listing." *Knox v. Astrue*, 572 F. Supp. 2d 926, 935 (N.D. Ill. 2008) (citing *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)).

The ALJ accepted the ME's testimony that Plaintiff did not meet Listing 12.05 because she has only mild restrictions in her activities of daily living, no difficulties in social functioning, and no episodes of decompensation. (R. 20). After noting the preliminary criteria for 12.05, including subaverage intellectual functioning and deficits in adaptive functioning, (R. 19), the ALJ went on to discuss the level of severity requirements. With respect to subsection (C), the ALJ acknowledged that Plaintiff has an FSIQ of 67, which is within the pertinent

range. He also observed, however, that despite a diagnosis of depression and complaints of anxiety and OCD, Plaintiff has not received any regular mental health treatment to address those issues. (R. 20). In that regard, Plaintiff stopped seeing Dr. Gavino in October 2009 and apparently only returned for treatment again a week prior to the hearing in January 2012. (R. 23). The ALJ also noted that Plaintiff "demonstrates significant strengths" that would help her in a work environment. For example, school records indicate that Plaintiff "is organized, willing to ask questions whenever she is in doubt, and able to complete her work timely given examples and repetition," and that she is "able to multitask with assignments and has a lot of energy and an outgoing personality." (R. 20, 172, 193). Plaintiff also repeatedly expressed interest in going to cosmetology school and pursuing a career in that area. (R. 20).

As for subsection (D), the ALJ found no evidence that Plaintiff has marked limitations in any of the required areas of functioning, or repeated episodes of decompensation. (R. 20-21). Dr. NieKamp assessed Plaintiff with a GAF score of 60, representing only moderate symptoms, (R. 276), and Dr. Voss similarly found only moderate limitations in concentration, persistence or pace; mild difficulties in social functioning and activities of daily living; and no episodes of decompensation. (R. 305). Though Plaintiff has problems handling money, she can "independently care for her personal hygiene needs, a 6-month old infant child and two pet dogs." In addition, she can drive, prepare simple meals, clean, shop, and do the laundry, and she enjoys spending time with friends and has been described as pleasant, funny and polite. (R. 21). These findings are

15

consistent with Dr. Sherman's observation that Plaintiff was "independent for household chores, travel and personal hygiene," and was able to articulate her ideas well with adequate judgment and no pervasive symptoms of emotional distress.  (R. 290).

Plaintiff does not claim to have the requisite deficits in "adaptive functioning" for purposes of 12.05, or raise any related challenge to the ALJ's decision.  As a result, Plaintiff has not met her burden of showing that she meets "*each* of the requirements set forth in the listing."  *Knox*, 572 F. Supp. 2d at 935 (emphasis added).  Moreover, the ALJ's decision details evidence demonstrating that Plaintiff is in fact able to "cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710.  Specifically, she can care for an infant, pets and her own personal hygiene; drive; clean; shop; and do laundry; and she enjoys hanging out with friends.  She also testified that she could live alone if she did not have to deal with money.  (R. 18-19).  *See, e.g., Charette v. Astrue*, 508 Fed. Appx. 551, 553-54 (7th Cir. 2013) (plaintiff did not establish deficits in adaptive functioning where he lived independently, managed household chores, took care of his pets, and socialized with other people).

Plaintiff attempts to minimize this evidence by citing testimony from herself, her mother and her stepfather that:  she only drives two times a month and rarely alone (R. 103, 123); she does not drive far because she cannot follow directions (R. 346); she has to "fix" a pile of laundry if it is not how she likes it (*id.*); she has difficulty trusting others (R. 269 (self report to Dr. NieKamp)); and she does not do a lot with her "couple of friends" except shop when they have

money. (R. 269, 348; Doc. 17, at 10). Plaintiff fails to explain how these statements refute opinions from Dr. Voss and the ME that she has at most mild difficulties in maintaining social functioning and carrying out activities of daily living; that she does not meet or medically equal Listing 12.05; and that she can perform simple work. (R. 20, 299, 305, 360). Nor does she articulate how the statements prove that she is incapable of coping with the challenges of ordinary, everyday life as contemplated by the listing.

"A condition that meets only some of the required medical criteria, 'no matter how severely,' does not meet a listing." *Brown v. Astrue*, No. 2:11-CV-00225, 2012 WL 3987184, at *7 (N.D. Ind. Sept. 11, 2012). Since the adaptive functioning element must be satisfied "*in addition to* the specific requirements articulated in Listing 12.05C" or D, Plaintiff has not met her burden at step three of the analysis. *Heckathorne v. Astrue*, No. 1:11-CV-00323, 2012 WL 2721916, at *6 (N.D. Ind. July 9, 2012) (emphasis in original). As the Seventh Circuit has explained, "a low IQ, but not an IQ below 60, is insufficient, even with the presence of some impairment, to establish disability per se on grounds of mental retardation. The reason is that persons with an IQ in the 60s (or even lower) may still be able to hold a full-time job." *Novy*, 497 F.3d at 709-10 (noting that employment opportunities for individuals with low IQs "are of course limited," but that "the social security disability program is not an unemployment-benefits law.").

Even assuming Plaintiff could show the necessary deficits in adaptive functioning, there is insufficient evidence that she also meets the requirements of

subsections (C) or (D).  Contrary to Plaintiff's assertion, no physician of record diagnosed her with a learning disability that would preclude her from all gainful employment pursuant to subsection (C).  (Doc. 17, at 8).  Despite noting a "reported" diagnosis of learning disability, Dr. NieKamp opined that Plaintiff would "flourish in an environment (i.e. home, educational, and vocational) that provides a consistent structure/routine and clear/ample prompts," (R. 271), and he anticipated that she could work in "entry level positions."[3]  (R. 275-76).  Dr. Voss similarly concluded that Plaintiff can understand and remember short instructions, complete one and two-step tasks, and adapt adequately to workplace situations notwithstanding her problems with memory, concentration and information processing.  (R. 293).  The ME likewise agreed that Plaintiff can perform simple tasks in a routine and unchanging structure.  (R. 361).

All three physicians were aware of Plaintiff's medical history and special education needs, and Plaintiff does not point to any other medical source who found that she has greater limitations sufficient to meet Listing 12.05(C).  (R. 269-71, 307, 361).  In addition, far from ignoring Plaintiff's psychological limitations, the ALJ expressly discussed her difficulties with concentration, memory, and "processing and utilizing needed information."  (R. 20-23).  On this record, there is no merit to Plaintiff's claim that the ALJ erred by adopting the ME's testimony, or in any way disregarded her mental deficits.  (Doc. 17, at 8, 9).

---

[3]     Plaintiff claims, without supporting citation, that "[t]he national economy does not provide significant numbers of jobs" for a person who needs a structured work environment.  (Doc. 17, at 9).  Such "undeveloped arguments" that are "unsupported by pertinent authority are waived."  *United States v. Elst*, 579 F.3d 740, 743 (7th Cir. 2009).

With respect to subsection (D), Plaintiff fails to identify any physician who found her to have marked limitations in any of the required areas of functioning, or any episodes of decompensation. (R. 21). As a result, there is no merit to Plaintiff's assertion that the ALJ somehow "cherry-picked" evidence to support his conclusion while ignoring contrary findings. (Doc. 17, at 10). *Cf. Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (where physician's notes reflected that the plaintiff experienced "mixed results" from her treatment, the ALJ erred in focusing only on the positive findings); *Perkins v. Astrue*, 498 Fed. Appx. 641, 643 (7th Cir. 2013) (remand required where the ALJ "failed to acknowledge that a cardiologist characterized [the claimant's] heart failure as Class III," disregarded physician notes stating that the claimant's hypertension was uncontrolled, and discounted other records noting "how poorly [the claimant's] heart was pumping blood."). Plaintiff may believe that her limitations in activities of daily living and social functioning are more than mild, but that in no way establishes that she suffers from the necessary marked limitations in those or any other area. (Doc. 17, at 9-10).

Viewing the record as a whole, the ALJ's conclusion that Plaintiff is not presumptively disabled by mental retardation under Listing 12.05 is supported by substantial evidence.

### 2. Credibility Assessment

Plaintiff next argues that the ALJ erred in finding her testimony not fully credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at

*2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Plaintiff objects to the ALJ's use of the following boilerplate credibility language: Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" stated RFC assessment. (R. 22). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless," noting that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). *See also Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

That said, the use of boilerplate language will not alone provide a basis for remand as long as "the ALJ said more" and gave reasons for not finding the plaintiff's testimony fully credible. *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (no error where ALJ used boilerplate language but then went on to question the plaintiff's testimony about resting and napping all day "given that he went hunting and apparently attempted to work on his car."). Defendant argues that the ALJ said more in this case by weaving his analysis into the discussion and discounting Plaintiff's testimony based on "her part time work activity; her sporadic treatment history; her non-compliance with prescribed treatment regimen; her daily activities; and the degree to which objective medical evidence supported the alleged severity of her impairments." (Doc. 25, at 7-8) (citing *Sawyer v. Colvin*, 512 Fed. Appx. 603, 608 (7th Cir. 2013)) ("That some of th[e] support for the ALJ's credibility assessment is woven into his analysis of [the plaintiff's] residual functional capacity, rather than a discussion limited to credibility, is insignificant. The regulations anticipate overlap."). The Court agrees.

The ALJ discussed Plaintiff's complaints of disabling anxiety and depression, but also noted that she had not been "compliant with the medication regimen prescribed to help her control these symptoms." (R. 23). The ALJ acknowledged Plaintiff's testimony that she stopped taking the medication due to the side effects, but found it significant that she also quit her mental health treatment altogether as a result. (R. 18, 23). In that regard, Plaintiff told Dr. Sherman that "because she kept forgetting to take her psychotropic medications,

she decided to just cancel her mental health appointments as well." (R. 23). And even without the medication or therapy, Plaintiff has "no history of psychiatric hospitalizations." (R. 23). The ALJ reasonably concluded that Plaintiff's failure to pursue mental health care for more than a year prior to the hearing undermined her claims of disabling anxiety and depression. *Shauger*, 675 F.3d at 696 ("[A] history of sporadic treatment . . . can undermine a claimant's credibility."). *Cf. Gillim v. Astrue*, No. 11 C 7146, 2013 WL 1901630, at *6 (N.D. Ill. May 7, 2013) (finding only that "a lack of psychiatric emergency room visits is not a sufficient reason for rejecting a severe mental impairment at step two.").

In discussing Plaintiff's OCD, the ALJ noted that she needs things to be neat and tidy, likes unwrinkled linens, sometimes re-cleans the house, and logs her daughter's food intake. (R. 23). He also observed, however, that the only evidence of an OCD diagnosis is from Dr. Sherman, who apparently based that opinion on Plaintiff's subjective allegations. (*Id.*). *See Davis v. Barnhart*, 187 F. Supp. 2d 1050, 1057 (N.D. Ill. 2002) (ALJ properly discounted expert opinion where it was "a diagnosis based on subjective complaints."). Plaintiff decided not to seek any related medical treatment, but still reported being able to engage in a wide variety of activities of daily living, including driving, doing laundry, preparing simple meals, cleaning, shopping, hanging out with friends, and caring for personal hygiene, her infant daughter, and pets. (R. 21). *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012) ("[A]n ALJ must consider the claimant's daily activities" in assessing credibility).

With respect to Plaintiff's mental abilities, the ALJ discussed her low FSIQ and difficulties with reading comprehension, math, and memory skills, but also cited contradictory school record evidence reflecting "various and significant strengths." (R. 22). For example, Plaintiff has been described as organized, willing to ask questions when in doubt, and able to multitask, and she demonstrated "the capacity to hold information such as lists of numbers, letters, or discrete bits of information in her memory for reasonable periods of time." (R. 22-23, 210). Plaintiff disputes that this evidence has any bearing on her credibility, professing to not even understand the meaning of the word "multitask" that appears in her IEP. (Doc. 17, at 12). It was not patently wrong, however, for the ALJ to consider such "statements and other information provided by . . . other persons about the symptoms and how they affect the individual." *Arnold*, 473 F.3d at 822.

Plaintiff claims that some of the ALJ's other observations likewise provide no reasonable basis for discounting her testimony. For example, the ALJ noted that Plaintiff "earned mostly A's, B's, and C's in her classes," (R. 22), but did not mention that these grades were "unweighted" and thus not reflective of "similar grades in mainstream classes." (Doc. 17, at 12 (citing R. 160)). In addition, the ALJ discussed Plaintiff's desire to attend cosmetology school but did not explain why this demonstrates that she is actually capable of working in that or any other field. (*Id.*). It is not clear to this Court that the ALJ affirmatively challenged Plaintiff's testimony based on the cited evidence, which also provides background on her medical condition. Regardless, it is well-established that

"even if the court finds some of the ALJ's reasons flawed, it will affirm so long as substantial evidence supports the credibility determination overall." *Felmey v. Colvin*, No. 13-C-219, 2013 WL 4502090, at *13 (E.D. Wis. Aug. 22, 2013) (citing *McKinzey*, 641 F.3d at 890-91). As discussed, the ALJ explained that Plaintiff was not fully credible for several valid reasons, including her lack of mental health treatment, her fairly extensive activities of daily living, and the objective school and medical evidence. These rationales more than suffice as substantial evidence supporting the ALJ's credibility determination. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are.") (emphasis in original).

Plaintiff cannot avoid this result by "nitpicking" at the decision to find factual details the ALJ did not mention, such as evidence that at age 17, her IEP indicated that she read at a 5.6 grade level, did math at a 3.5 grade level, and wrote at a 7.2 grade level. (Doc. 17, at 12). An ALJ "is not required to mention every piece of evidence" as long as he builds "an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled." *Craft*, 539 F.3d at 673 (internal quotations omitted). Here, the ALJ clearly considered Plaintiff's IEPs along with other relevant evidence in accordance with SSR 96-7p, and the Court can trace his reasons for discounting Plaintiff's testimony. On the record presented, the ALJ's credibility finding is not patently wrong. *Elder*, 529 F.3d at 413-14; *Simila*, 573 F.3d at 517 (an ALJ's credibility determination is entitled to "deference, for an ALJ, not a reviewing court, is in the best position to evaluate credibility."); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th

Cir. 2004) (court will "give the opinion a commonsensical reading rather than nitpicking at it.").

### 3.   RFC Determination

Plaintiff argues that the case must still be reversed based on the ALJ's flawed RFC determination.  A claimant's RFC is the maximum work that she can perform despite any limitations.  20 C.F.R. § 404.1545(a)(1); SSR 96-8p.  The RFC determination is a legal decision rather than a medical one.  20 C.F.R. § 404.1527(d)(2).   "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'"  *Craft*, 539 F.3d at 676.

The ALJ found that Plaintiff can work at all exertional levels except that she is limited to performing unskilled work involving simple, routine tasks in a routine structure with no decision-making.   (R. 22).   This finding is amply supported by the available medical evidence, including:  (1) Dr. NieKamp's June 2010 assessment that Plaintiff would likely "flourish in an environment (i.e. home, educational, and *vocational*) that provides a consistent structure/routine and clear/ample prompts," though she would be limited to "entry level positions" (R. 271, 276) (emphasis added); (2) Dr. Voss's March 2011 assessment that Plaintiff can "understand and remember short instructions and complete simple one and two-step tasks"; "maintain attention, concentration and persistence necessary to carry out simple one and two-step tasks at a consistent pace over a regular 40 hr work week"; "adapt adequately to work situations and changes that occur in the usual workplace with reasonable support and structure"; "be aware of normal

hazards, plan independently and set realistic goals"; and "use public transportation or travel independently in unfamiliar settings" (R. 293); and (3) the ME's testimony that Plaintiff can perform simple tasks in a routine and unchanging structure. (R. 361).

Given that the ALJ cited to and discussed all of this evidence, along with Plaintiff's school records and reported activities of daily living, (R. 20, 22-24), there is absolutely no merit to Plaintiff's argument that the ALJ somehow failed to consider her mental impairments in determining an RFC, or improperly relied on the ME's opinion in that regard. (Doc. 17, at 13-15). The ME did express some confusion as to whether she should consider the hearing testimony as part of her medical analysis, (R. 366-67), but there can be no dispute that the ALJ considered that evidence. (R. 18-19, 23). Moreover, Plaintiff does not point to any medical evidence that either contradicts the stated RFC or suggests she has more severe limitations. *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011) (citing *Rice*, 384 F.3d at 370) (the ALJ "was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination."). Plaintiff may believe that her anxiety and low FSIQ render her incapable of working without excessive levels of supervision or assistance, (Doc. 17, at 14-15), but that is wholly insufficient to reverse the ALJ's decision absent any corroborating medical evidence.

The Court also finds no support for Plaintiff's assertion that the ALJ neglected to apply the "special technique" in examining her mental impairment.[4] (Doc. 17, at 13). The ALJ's detailed analysis in that regard appears at R. 20-21, and includes an assessment of all the relevant evidence. Once again, the ALJ's failure to specifically mention every piece of testimony and evidence in the record, such as Plaintiff's "difficulty with vocabulary above the 4th and 5th grades," (Doc. 17, at 13), in no way demonstrates that the ALJ failed to build a logical bridge from the evidence to his conclusion. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's RFC determination is supported by substantial evidence, and Plaintiff's motion for summary judgment on that basis is denied.

### 4.    The Grids

Plaintiff finally objects to the ALJ's reliance on section 204.00 of the Grids in finding her capable of a significant number of jobs available in the national economy. (Doc. 17, at 15). Where a claimant "has no exertional limitations, the ALJ appropriately refer[s] to section 204.00 of the Grid." *Goffron v. Astrue*, 859 F. Supp. 2d 948, 960 (N.D. Ill. 2012). Here, Plaintiff does not claim to have any exertional limitations, and the record reflects that none exist, so the ALJ's reliance on section 204.00 was entirely proper. Plaintiff objects that the Grids cannot be used to direct a finding of not disabled where, as here a claimant

---

[4]    "The special technique requires that the ALJ evaluate the claimant's 'pertinent symptoms, signs, and laboratory findings' to determine whether the claimant has a medically determinable mental impairment." *Craft*, 539 F.3d at 674 (quoting 20 C.F.R. § 404.1520a(b)(1)).

suffers from nonexertional limitations. (Doc. 17, at 15) (citing *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981)). This argument ignores the fact that the ALJ did not rely exclusively on the Grids but also cited to SSR 85-15. (R. 25).

SSR 85-15 states that "[w]here there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work." *Goffron*, 859 F. Supp. 2d at 961 (quoting SSR 85-15, 1985 WL 56857, at *4). According to the Social Security Administration, an RFC of "unskilled" work is appropriate where "the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting." *Craft*, 539 F.3d at 677 (citing 20 C.F.R. § 404.1545(c)). As discussed earlier, every physician of record agreed that Plaintiff is capable of those unskilled functions. Thus, the ALJ reasonably concluded that there are a significant number of jobs available to a person with Plaintiff's RFC.[5] *See Goffron*, 859 F. Supp. 2d at 962 (where the plaintiff suffered from only nonexertional limitations, the ALJ "appropriately used [section 204 of] the Grid as a framework, in combination with other guidance from relevant Social Security Rulings [including SSR 85-15], to determine that a significant number of jobs exist in the national economy that Claimant can perform.")

---

[5]  The Court notes that portions of Plaintiff's brief are somewhat muddled, making the arguments difficult to decipher. To the extent she intended to assert additional grounds for reversal not specifically addressed here, those arguments are inadequately developed and therefore waived. *Elst*, 579 F.3d at 743.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 16) is denied, and Defendant's Motion for Summary Judgment (Doc. 24) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: May 30, 2014

SHEILA FINNEGAN
United States Magistrate Judge